UNITED STATES DISTRICT COURT 2 6 2 9 JLT
DISTRICT OF MASSACHUSETTS

MAGISTRATE JUDGE Alexander

ANITA WALKER, individually and on behalf of all
others similarly situated,

Civil Action No.

               Plaintiff,

               vs.

MASSACHUSETTS FINANCIAL SERVICES
COMPANY, MASSACHUSETTS FINANCIAL
SERVICES COMPANY RETIREMENT
COMMITTEE, JEFFREY L. SHAMES, JOSEPH W.
DELLO RUSSO, ERIC BURNS, AND DOES 1 -
100,

               Defendants.

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT
INCOME SECURITY ACT**

AMOUNT $ 60
SUMMONS ISSUED Yes
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK
12/30/03

     Plaintiff Anita Walker, a participant in the MFSavings Retirement Plan (the "Plan")

during the relevant time period, on behalf of herself and a class of all others similarly situated,

alleges as follows:

## INTRODUCTION

    1.    This is a class action brought pursuant to § 502 of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Plan fiduciaries, including

Massachusetts Financial Services Company ("MFS" or the "Company").

    2.    401(k) plans confer tax benefits on participating employees to incentivize saving

for retirement and/or other long-term goals. Employees participating in a 401(k) plan may have

the option of purchasing the mutual fund investment options created by their employer, often the

sponsor of the plan, for part of their retirement investment portfolios. A number of mutual funds

within the MFS family of mutual funds, which include the MFS Capital Opportunities Fund,

MFS Core Growth Fund, MFS Emerging Growth Fund, MFS Large Cap Growth Fund, MFS

Managed Sectors Fund, MFS Mid Cap Growth Fund, MFS New Discovery Fund, MFS New

Endeavor Fund, MFS Research Fund, MFS Strategic Growth Fund, MFS Technology Fund,

Massachusetts Investors Growth Stock, MFS Mid Cap Value Fund, MFS Research Growth and

Income Fund, MFS Total Return Fund, MFS Union Standard Equity Fund, MFS Utilities Fund,

MFS Value Fund, Massachusetts Investors Trust, MFS Aggressive Growth Allocation Fund,

MFS Conservative Allocation Fund, MFS Moderate Allocation Fund, MFS Bond Fund, MFS

Emerging Markets Debt Fund, MFS Government Limited Maturity Fund, MFS Government

Mortgage Fund, MFS Government Securities Fund, MFS High Income Fund, MFS High Yield

Opportunities Fund, MFS Intermediate Investment Grade Bond Fund, MFS Limited Maturity

Fund, MFS Research Bond Fund, MFS Strategic Income Fund, MFS Alabama Municipal Bond

Fund, MFS Arkansas Municipal Bond Fund, MFS California Municipal Bond Fund, MFS

Florida Municipal Bond Fund, MFS Georgia Municipal Bond Fund, MFS Maryland Municipal

Bond Fund, MFS Massachusetts Municipal Bond Fund, MFS Mississippi Municipal Bond Fund,

MFS Municipal Bond Fund, MFS Municipal Limited Maturity Fund, MFS New York Municipal

Bond Fund, MFS North Carolina Municipal Bond Fund, MFS Pennsylvania Municipal Bond

Fund, MFS South Carolina Municipal Bond Fund, MFS Tennessee Municipal Bond Fund, MFS

Virginia Municipal Bond Fund, MFS West Virginia Municipal Bond Fund, MFS Emerging

Markets Equity Fund, MFS Global Equity Fund, MFS Global Growth Fund, MFS Global Total

Return Fund, MFS International Growth Fund, MFS International New Discovery Fund, MFS

International Value Fund, and MFS Research International Fund (collectively the funds offered

under the Plan are referred to as the "MFS Funds") are investment alternatives in the Plan.

3.    Plaintiff Anita Walker was an employee of MFS and was a participant in the Plan during the relevant time period. Plaintiff's retirement investment portfolio included MFS Funds.

4.    Plaintiff alleges that defendants, as fiduciaries of the Plan, breached their duties to her and to the other participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of MFS Funds.

5.    During the Class Period, defendants knew or should have known that MFS Funds were imprudent investment alternatives for the Plan. Defendants played an active role in implementing unlawful mutual fund trading methods utilized by the Company to artificially dilute the value of certain investment alternatives within the Plan, namely, the MFS Funds, or had intimate knowledge of these activities.

6.    Defendants are liable under ERISA to restore losses sustained by the Plan as a result of their breaching of their fiduciary obligations.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.    Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some defendants reside or maintain their primary place of business in this district.

## PARTIES

**Plaintiff**

9.    Plaintiff Anita Walker was an MFS employee, was a participant in the Plan

pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held MFS Funds in her retirement investment portfolio.

**Defendants**

10.    Defendant MFS is a registered investment adviser located in Boston, Massachusetts. MFS manages the MFS Funds. The Company maintains its principal place of business at 500 Boylston Street, Boston, MA 02116. According to the Company's Form 5500, filed with the Department of Labor ("DOL") for the fiscal year ended December 31, 2001 (the "2001 Form 5500"), MFS is the Plan sponsor. Upon information and belief, MFS was a fiduciary of the Plan within the meaning of ERISA in that it exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

11.    Defendant Massachusetts Financial Services Corporation Retirement Committee ("Retirement Committee") is the designated Plan Administrator. As Plan Administrator, the Retirement Committee was a fiduciary of the Plan within the meaning of ERISA in that it, and its individual members, exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

12.    Defendant Jeffrey L. Shames ("Shames") is the Chairman of MFS and signed the Company's 2001 Form 5500 as the Plan Administrator. Upon information and belief, Shames was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

13.    Defendant Joseph W. Dello Russo ("Dello Russo") signed the Company's 2001

Form 5500 on behalf of the Company as Plan Sponsor. Upon information and belief, Dello

Russo was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary

authority with respect to management and administration of the Plan and/or management and

disposition of the Plan's assets.

14.    Defendant Eric Burns ("Burns") served as Secretary of the Retirement Committee

during the Class Period. Upon information and belief, Burns was a fiduciary of the Plan within

the meaning of ERISA in that he exercised discretionary authority with respect to management

and administration of the Plan and/or management and disposition of the Plan's assets.

15.    There are fiduciaries of the Plan whose identities are currently unknown to

plaintiff, including the individual members of the Retirement Committee, Plan Trustee(s) and

other individual fiduciaries. Once their identities are ascertained, plaintiff will seek leave to join

them under their true names.

16.    Defendants include named and de facto fiduciaries with respect to the Plan. All

defendants exercised discretionary authority or control regarding management of the Plan,

management of the Plan's assets, and/or administration of the Plan.

## THE PLAN

17.    The MFSavings Retirement Plan is an "employee pension benefit plan," as

defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A). The relief requested in this action is for

the benefit of the Plan and its participants/beneficiaries.

18.    According to the 2001 Form 5500, the Plan is a defined contribution plan

sponsored by MFS for the benefit of employees of the Company.

19.    Upon information and belief, Plan participants are permitted each pay period to

contribute a percentage of their compensation into the Plan, and direct their contributions into one of a number of mutual funds and fixed income investments. Among these investment alternatives, participants can choose to direct all or part of their contributions into various MFS Funds.

20.      According to the Company's 2001 Form 5500, as of December 31, 2001, the Plan's interest in registered investment companies (i.e. mutual funds) totaled **$54,009,970**, or **97.6%** of the Plan's total assets.

21.      Upon information and belief, among the Plan's mutual fund investments are at least one, if not more of the following:  the MFS Emerging Growth Fund, Massachusetts Investors Trust Fund, Massachusetts Investors Growth Stock Fund, MFS Research Fund, and MFS Total Return Fund.  As discussed below, internal Company memoranda have revealed that the Company permitted illegal timing activity to occur in all five of these funds.

22.      Some or all of the MFS Funds were materially inflated at all times during the Class Period as a result of the Company's failure to disclose that it had diluted the value of the MFS Funds through its unlawful timing activities.  Furthermore, based on information and belief, it is likely that the MFS Funds will continue to drop in value as more details emerge on the Company's illegal timing activities, and as MFS incurs currently indeterminate fines, restitution, and settlement fees.

## CLASS ACTION ALLEGATIONS

23.      Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between December 15, 1998 and the present (the "Class Period") and whose accounts included investments in MFS Funds.

24.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time, and can only be ascertained through appropriate discovery, plaintiff believes there are, at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

25.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether defendants each owed a fiduciary duty to plaintiff and members of the Class;

      (b)    whether defendants breached their fiduciary duties to plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

      (c)    whether defendants violated ERISA; and

      (d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

26.    Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

27.    Plaintiff will fairly and adequately protect the interests of the members of the

00001345.WPD ; 1                                  -7-

Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

28.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

29.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## DEFENDANTS' FIDUCIARY STATUS

30.    During the Class Period, upon information and belief, defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

31.    During the Class Period, all of the defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

32.    ERISA requires every plan to provide for one or more named fiduciaries who will

have "authority to control and manage the operation and administration of the plan." § 402(a)(1), 29 U.S.C. § 1102(a)(1). Upon information and belief, at least MFS is a named fiduciary of the Plan.

33.    Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, MFS chose to internalize this fiduciary function.

34.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. Section 3(21)(A)(i) of ERISA, 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

## DEFENDANTS' CONDUCT

A.    **MFS Funds Were Imprudent Investments for the Plan**

1.    **Illegal Market Timing Schemes**

35.    This action concerns a fraudulent scheme and course of action which was intended to, and indeed did, benefit the Company at the expense of unsuspecting Plan participants. In connection therewith, defendants violated their fiduciary duties to Plan participants in return for substantial fees and other income for themselves and their affiliates.

36.    The actions of the defendants have harmed plaintiff and members of the class. In essence, the defendants' have diluted the interests of Plan participants by allowing, upon information and belief, market timing to occur in at least one, and likely a number of the MFS

Funds that were investment alternatives in the Plan.

37.    Mutual funds are designed for buy-and-hold investors, and are therefore the favored homes for Americans' retirement and college savings accounts. In mutual funds, the market value of a fund share is known as the Net Asset Value ("NAV"). Since mutual funds hold a number of securities, the net asset value must be calculated at the end of day on a daily basis (as opposed to stocks that change prices by the second). Thus, quick-turnaround traders routinely try to trade in and out of certain mutual funds in order to exploit inefficiencies in the way mutual funds set their NAV.

38.    This "in and out" strategy works only because some funds use "stale" prices to calculate the value of securities held in the fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese shares. Because of the time zone difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his or her fund to arrive at an NAV at 4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks the fund holds. On such a day, a trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

39.    Effective timing captures an arbitrage profit that comes ***dollar-for-dollar out of the pockets of the long-term investors***:  the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund.  If the timer sells short on bad days the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

40.    Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways.  They impose their short-term transaction costs on the long-term investors.  Indeed, trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market.  Accordingly, fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock.  This "strategy" does not eliminate the transfer of wealth out of the mutual fund caused by timing; it only reduces the administrative cost of those transfers.  However, at the same time it can also reduce the overall performance of the fund by requiring the fund manager to keep a certain amount of the funds' assets in cash at all times, thus depriving the investors of the advantages of being fully invested in a rising market.  Some fund managers even enter into special investments as an attempt to "hedge" against timing activity (instead of just refusing to allow it), thus deviating altogether from the ostensible investment strategy of their funds, and incurring further transaction costs.

41.    Mutual fund managers are well aware of the damaging effect that timers have on their funds.  While it is virtually impossible for fund managers to identify every timing trade,

large movements in and out of funds are easy for managers to spot, and mutual fund managers have tools to fight back against timers.

42.     Fund managers typically have the power simply to reject timers' purchases. As fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

43.     The incentive to engage in such wrongdoing is as follows. Typically a single management company sets up a number of mutual funds to form a family. While each mutual fund is in fact its own company, as a practical matter the management company runs it. The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the management company, not the mutual funds themselves. Still, the management company owes fiduciary duties to each fund and each investor.

44.     The management company makes its profit from fees it charges the funds for financial advice and other services. These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes. The timer understands this perfectly, and frequently offers the manager more assets in exchange for the right to time. Fund managers have succumbed to temptation and allowed investors in the target funds to be hurt in exchange for additional money in their own pockets in the form of higher management fees.

45.     Thus, by keeping money – often many millions of dollars--in the same family of mutual funds (while moving the money from fund to fund), the market timer assured the manager that he or she would collect management and other fees on the amount whether it was in the

target fund, the resting fund, or moving in between. In addition, sometimes the manager would waive any applicable early redemption fees. By doing so, the manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of timing.

46.    As an additional inducement for allowing the timing, fund managers often received "sticky assets," which assured a steady flow of fees to the manager.

47.    These arrangements were never disclosed to mutual fund investors such as Plan participants. On the contrary, many of the relevant mutual fund prospectuses contained materially misleading statements assuring investors that the fund managers discouraged and worked to prevent mutual fund timing.

### 2.    The Timing Scheme at MFS

48.    Upon information and belief, the defendants permitted illegal timing to occur in at least one, and likely a number, of the MFS Funds available to Plan participants as investment alternatives.

49.    It is widely acknowledged that timing inures to the detriment of long-term shareholders such as plaintiff and similarly situated Plan participants by diluting their investment holdings. Because of this detrimental effect, mutual fund prospectuses typically state that timing is monitored and the funds work to prevent it. Nonetheless, in return for investments that would increase fund managers' fees, fund managers entered into undisclosed agreements to allow timing.

50.    The mutual fund prospectuses for the MFS Funds at issue created the misleading impression that the Company was vigilantly protecting investors against the negative effects of timing by specifically stating that MFS **did not permit** market timing to occur in its mutual

funds. In fact, the opposite was true: MFS managers sold the right to time their funds to certain

market timers. The prospectuses were silent about these arrangements. For example,

prospectuses distributed to MFS Funds customers (including, upon information and belief, Plan

participants) plainly state:

> MFS Funds **do not permit** market timing or other excessive trading
> practices. Excessive, short-term (market timing) trading practices
> may disrupt portfolio management strategies and harm fund
> performance. MFS Funds **will reject or restrict** an investor's
> purchase orders if there is a history of market timing. (Emphasis
> added).

51.    Contrary to such language, MFS created a specific class of mutual funds through

which it allowed illegal market timing to occur.

52.    As a result of the "timing" of the MFS Funds, certain market timers, the

Company, and their intermediaries profited handsomely. The losers were unsuspecting Plan

participants and other long-term mutual fund investors. Thus, the defendants' profits came

dollar-for-dollar out of the pockets of investors such as plaintiff and similarly situated Plan

participants.

### 3.    The Timing Scheme Unfolds

53.    On September 3, 2003, the New York State Attorney General Elliot Spitzer (the

"Attorney General") attacked the mutual fund industry by filing a complaint charging fraud

against Canary Capital Partners, LLC, Canary Capital Partners, Ltd. and Canary Investment

Management, LLC (collectively, "Canary") in connection with the unlawful mutual practices of

late trading and timing. More specifically, the Attorney General alleged the following: "Canary

developed a complex strategy that allowed it to in effect sell mutual funds short and profit on

declining NAVs." Additionally, the Attorney General alleged that Canary set up arrangements with Bank of America, Bank One, Janus, and Strong to late trade and time those companies respective mutual funds. The Attorney General further alleged:

> Bank of America...(i) set Canary up with a state-of-the art electronic late trading platform, allowing it to trade late in the hundreds of mutual funds that the bank offers to its customers, (ii) gave Canary permission to time the Nations Funds Family (iii) provided Canary with approximately $300 million of credit to finance this late trading and timing, and (iv) sold Canary the derivative short positions it needed to time the funds as the market dropped. None of these facts were disclosed in the Nations Funds prospectuses. In the process, Canary became one of Bank of America's largest customers. The relationship was mutually beneficial in that Canary made tens of millions through late trading and timing, while the various parts of the Bank of America that serviced Canary made millions themselves.

54.    In connection with an examination of active trading of mutual fund shares by the SEC and the Attorney General, MFS received inquiries and subpoenas for documents from those agencies.

55.    On December 8, 2003, Sun Life (MFS's parent company) and MFS announced that the staff of the Boston office of the SEC had indicated that it intended to recommend to the SEC that an enforcement action be taken against MFS alleging, in effect, that the disclosure in certain of MFS's fund prospectuses concerning market timing was misleading, and breach of fiduciary duty.

56.    On December 9, 2003, The New York Times (the "Times") reported that MFS "allowed privileged clients to trade quickly in and out of its biggest funds while saying it restricted the practice for the vast majority of its shareholders, according to a memorandum from a senior company executive." The Times further reported that the memorandum showed that in

2001, executives at MFS essentially created two classes of funds - a small group of large funds that would accept rapid-fire trades, a practice known as market timing, and a larger group of international funds that would not. At no time, though, did MFS change the language in its prospectuses, which said that market timing was not permitted in any of its funds. Additionally, the <u>Times</u> reported that "[a]mong the most popular offerings was MFS Emerging Growth, one of the five equity funds that MFS made available to market timers. But no restrictions were placed on Massachusetts Investors Trust, Massachusetts Investors Growth Stock Fund, MFS Research Fund, MFS Total Return Fund or the emerging growth fund. The rationale was that because these funds were very large and liquid, excessive trading would not harm shareholders."

57.     The defendants, in permitting, upon information and belief, the illegal timing activity to occur in the MFS Funds, have breached their fiduciary duties to plaintiff and the class by lying to Plan participants about their effort to curb market timers by entering into undisclosed agreements intended to boost their fees and permitting their own managers to time the MFS mutual funds.

**B.     Defendants Knew or Should have Known that MFS Funds Were Not Prudent Plan Investments**

58.     Throughout the Class Period, the Company engaged in illegal conduct involving timing of the MFS Funds, which, upon information and belief, constituted the *vast majority* of the available investment alternatives in the Plan.

59.     The Company's illegal timing activities materially diluted the value of the MFS Funds.

60.     At all relevant times, defendants knew or should have known that MFS was

improperly diluting the revenues of the MFS Funds by devising and implementing a scheme to obtain substantial fees and other income for themselves and their affiliates by allowing favored investors to engage in timing of the MFS Funds throughout the Class Period and in violation of their fiduciary duties to the Plan participants.

61.    Defendants failed to conduct an appropriate investigation into whether the MFS Funds were prudent investments for the Plan and, in connection therewith, failed to provide the Plan participants with information regarding the true investment worthiness of the MFS Funds, such that other fiduciaries and the Plan participants could make informed decisions regarding the MFS Funds and otherwise failed to protect the Plan and its participants against inevitable losses.

62.    An adequate investigation by defendants would have revealed to a reasonable fiduciary that investment by the Plan in the MFS Funds, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made a different investment decision.

63.    Because defendants knew or should have known that MFS Funds were not prudent investment options for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in MFS Funds.

64.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of MFS Funds; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; or resigning as Plan fiduciaries to the extent that as a result of their employment by the Company they could not loyally serve Plan participants in

connection with the Plan's acquisition and holding of MFS Funds.

C.    **Defendants Regularly Communicated with Plan Participants Concerning Purchases of MFS Funds, Yet Failed to Disclose the Imprudence of Investment in MFS Funds**

65.    Upon information and belief, the Company regularly communicated with employees, including Plan participants, about the performance and prospects of the MFS Funds, collectively, upon information and belief, the largest single asset class in the Plan. During the Class Period, the Company fostered a positive attitude toward the MFS Funds, and/or allowed Plan participants to follow their natural bias towards investment in the mutual fund offerings of their employer by not disclosing negative material information concerning investment in the MFS Funds. As such, Plan participants could not appreciate the true risks presented by investments in the MFS Funds and therefore could not make informed decisions regarding investments in the Plan.

## CLAIMS FOR RELIEF UNDER ERISA

66.    At all relevant times, defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

67.    ERISA § 502, 29 U.S.C. §1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

68.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through

use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

69.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence* under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

70.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the *duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law." They entail, among other things,

    a. The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance, MFS Funds, to ensure that each investment is a suitable option for the plan; and

    b. A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

71.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

    "...in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or